IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

GOVERNOR JOSH SHAPIRO; RUSSELL
REDDING, IN HIS OFFICIAL CAPACITY
AS SECRETARY OF THE
PENNSYLVANIA DEPARTMENT OF
AGRICULTURE; and THE
PENNSYLVANIA DEPARTMENT OF
AGRICULTURE,

          Plaintiffs,

      v.

U.S. DEPARTMENT OF AGRICULTURE;
BROOKE ROLLINS, IN HER OFFICIAL
CAPACITY AS SECRETARY OF THE U.S.
DEPARTMENT OF AGRICULTURE; and
THE AGRICULTURAL MARKETING
SERVICE,

          Defendants.

No.

## COMPLAINT

### INTRODUCTION

1.     This action challenges a determination by the U.S. Department of Agriculture ("USDA") that a food assistance program in which 100% of funds are used to buy food from local farmers that is then distributed through Pennsylvania's charitable food network to people and communities experiencing hunger no longer effectuates USDA's priorities.

2.     Based on this determination, USDA has terminated the Local Food Purchase Assistance 2025 Cooperative Agreement ("LFPA25 Agreement"), which it executed with the Pennsylvania Department of Agriculture ("PDA") only several months ago.

3.     Through the LFPA25 Agreement, USDA had committed to provide PDA just over $13 million for PDA to "[p]urchase local, unprocessed or minimally processed domestic foods from local producers, targeting historically underserved farmers/producers/fishers and small businesses including processors, aggregators, and distributors" and then to "[d]istribute the food purchased to underserved communities."

4.     The LFPA25 Agreement did not create a new program. Instead, it supplied further funding to Pennsylvania's existing Local Food Purchase Assistance Program ("LFPA"), which PDA was already successfully operating with two prior rounds of funding—totaling nearly $30 million—from USDA. Through that prior funding, PDA has helped provide nearly 30 million pounds of food sourced from Pennsylvania farmers and food distributors to over 6.1 million Pennsylvania households.

5.     Despite the success of the LFPA program, in March 2025 USDA notified PDA that the federal agency would terminate the LFPA25 Agreement under 2 C.F.R. § 200.340(a)(4) because, the federal agency asserted, that agreement "no

longer effectuates agency priorities." The formal termination letter, sent 60 days after the notice, confirmed that the LFPA25 Agreement was "terminated in accordance with 2 CFR § 200.340(a)(4) and the terms and conditions of the award."

6.      Neither the termination notice nor the termination letter explained why USDA had determined that a program that uses 100% of its funding to feed hungry families no longer effectuated its priorities. Nor did either document identify the factors the federal agency had considered to make its decision, indicate that USDA had at all accounted for those who were relying on the agreement, or acknowledge that USDA's decision represented a change in the agency's position.

7.      PDA wrote to USDA on two separate occasions seeking to understand the basis for the Agency's conclusion that the program no longer effectuated agency priorities and to invoke PDA's right to formally appeal the decision. USDA did not respond to either letter.

8.      For all these reasons, USDA's regulatory termination of the LFPA25 Agreement is arbitrary and capricious and violates the regulations that the federal agency purported to follow.

9.      Accordingly, USDA's decision to terminate the LFPA25 Agreement should be vacated.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

Jurisdiction is also proper under the judicial review provisions of the Administrative

Procedure Act. *See* 5 U.S.C. § 702.

11.     Venue is proper in this district under 28 U.S.C. § 1391(b)(2), (e)(1).

Defendants are United States agencies or officers sued in their official capacities.

Governor Josh Shapiro, Secretary Russell Redding, and PDA reside in this district

and a substantial part of the events giving rise to this Complaint occurred and

continue to occur within this district.

## PARTIES

**A.     Plaintiffs**

12.     Josh Shapiro is the Governor of Pennsylvania. He brings this case in

his official capacity.

13.     The Pennsylvania Constitution vests "[t]he supreme executive power"

in the Governor. Pa. Const. art. IV, § 2. The Governor oversees all executive

agencies in Pennsylvania.

14.     Russell Redding is the Pennsylvania Secretary of Agriculture. He

brings this case in his official capacity.

15.     The Pennsylvania Department of Agriculture is an executive agency

within the Commonwealth of Pennsylvania. *See* 71 P.S. § 441.

**B.      Defendants**

16.      Defendant U.S. Department of Agriculture is a cabinet agency within the executive branch of the United States government. *See* 7 U.S.C. § 2201.

17.      Defendant Brooke Rollins is the Secretary of the U.S. Department of Agriculture, and that agency's highest ranking official. She is charged with the supervision and management of all decisions and actions of that agency. *See* 7 U.S.C. § 2201. She is sued in her official capacity.

18.      Defendant Agricultural Marketing Service ("AMS") is an agency within USDA. It administers programs that create domestic and international marketing opportunities for U.S. farmers and food producers.

## FACTS

**A.      The Local Food Purchase Assistance Program in Pennsylvania**

19.      USDA is statutorily charged with administering federally funded emergency food programs that purchase food from domestic farmers and food producers to then distribute to communities and individuals in need. *See generally* 7 U.S.C. §§ 7501-7518.

20.      LFPA is one such program.

21.      Through LFPA, USDA provides grants to states and other government entities "to purchase foods produced within the state or within 400 miles of the

delivery destination to help support local, regional and underserved producers."[1] The program's purpose "is to maintain and improve food and agricultural supply chain resiliency," and the program allows states "to procure and distribute local and regional foods and beverages that are healthy, nutritious, unique to their geographic areas and that meet the needs of the population." Food purchased from these local producers "will serve feeding programs, including food banks and organizations that reach underserved communities. In addition to increasing local food consumption, the funds will help build and expand economic opportunity for local and underserved producers."

22.    Funding for LFPA initially came from the American Rescue Plan Act of 2021, through which Congress appropriated $4 billion to "purchase food and agricultural commodities"; "to purchase and distribute agricultural commodities (including fresh produce, dairy, seafood, eggs, and meat) to individuals in need, including through delivery to nonprofit organizations and through restaurants and other food related entities, as determined by the Secretary, that may receive, store, process, and distribute food items"; and to "make loans and grants and provide other assistance to maintain and improve food and agricultural supply chain resiliency." Pub. L. No. 117-2, § 1001, 135 Stat. 10 (2021).

---

[1] *See Local Food Purchase Assistance Cooperative Agreement Program*, USDA, available at: https://www.ams.usda.gov/selling-food-to-usda/lfpacap (last visited June 4, 2025).

23.    Pennsylvania received $15,200,000 from the initial round of funding appropriated for the LFPA program.

24.    Pennsylvania's LFPA program subcontracts with Feeding Pennsylvania, a statewide organization of food banks that works through approximately one dozen large regional food banks to purchase food from approximately 190 local farmers. The regional food banks distribute food to a network of thousands of local food pantries and soup kitchens across Pennsylvania that serve individuals and communities with limited access to food.

25.    In 2022, USDA announced it was expanding the LFPA program with $464 million in funding from the Commodity Credit Corporation ("CCC"), a government-owned corporation chaired by, and subject to the direction of, the U.S. Secretary of Agriculture. Among other powers, CCC is authorized to "[p]rocure agricultural commodities (other than tobacco) for sale to other Government agencies, foreign governments, and domestic, foreign, or international relief or rehabilitation agencies, and to meet domestic requirements." 15 U.S.C. § 714c(c).

26.    This second round of funding for LFPA was called LFPA Plus. Pennsylvania received $14,724,610 for its LFPA program through this round of funding.

27. Between the initial LFPA award and the LFPA Plus award, Pennsylvania provided about 30 million pounds of food sourced from Pennsylvania farmers and food distributors to more than 6.1 million Pennsylvania households.

28. By the end of May 2025, PDA had less than $30,000 remaining from the nearly $30 million awarded under the original LFPA funding round and the LFPA Plus round, and soon will have used the full award.

**B.    The LFPA25 Agreement**

29. In October 2024, USDA announced another funding opportunity for states' LFPA programs—referred to as LFPA25.

30. On or about December 19, 2024, a designated representative of the USDA signed the LFPA25 Agreement for Pennsylvania. PDA countersigned the LFPA25 Agreement eight days later. A true and correct copy of the LFPA25 Agreement is attached as Exhibit 1.

31. The stated goal of the LFPA25 Agreement is "to support to maintain and improve food and agricultural supply chain resiliency through the procurement of local, domestic and unprocessed or minimally processed agricultural commodities." Funding under the agreement is to "be used to purchase local, unprocessed or minimally processed domestic foods."

32.     The LFPA25 Agreement did not state, however, that this stated goal was a material term or condition of the grant award or that a change in this stated goal might give rise to termination of the grant award.

33.     Among other things, USDA's responsibility under the agreement was to provide the Commonwealth with "$13,003,131 to cover allowable costs."

34.     PDA's responsibility under the agreement was to "[p]urchase local, unprocessed or minimally processed domestic foods from local producers, targeting historically underserved farmers/producers/fishers and small businesses including processors, aggregators, and distributors" and to "[d]istribute the food purchased to underserved communities."

35.     The LFPA25 Agreement was to be executed "according to all applicable parts of Title 2 of the Code of Federal Regulations (CFR), Parts 25, 170, 200, and 400 or as they may be later revised, and successive published regulations as appropriate."

36.     The agreement permitted USDA to prohibit use of funds awarded if it determined that PDA was not in compliance with the agreement's terms.

**C.     USDA's Regulatory Termination of the LFPA25 Agreement**

37.     On March 7, 2025, Jack Tuckwiller, Deputy Administrator of AMS, sent a letter to PDA notifying the state agency that the LFPA25 Agreement would be terminated in 60 days "in accordance with 2 C.F.R. § 200.340(a)(4) and the terms

and conditions of the award." A true and correct copy of that letter is attached as Exhibit 2.

38.     Quoting § 200.340, the letter stated that AMS had determined that the LFPA25 Agreement "no longer effectuates agency priorities" and thus that "termination of the award is appropriate."

39.     The notice specified that it was being sent "[p]ursuant to 2 CFR § 200.341."

40.     Significantly, the LFPA25 termination notice communicated that §240.340 was the primary basis for terminating the LFPA25 Agreement, signaling USDA was using purported regulatory—rather than contractual—authority to terminate the agreement.

41.     Although the LFPA25 termination notice refers to the "terms and conditions of the award," no term or condition of the award is cited.

42.     The LFPA25 termination letter did not state why the LFPA25 Agreement no longer effectuated USDA priorities. Nor did it state whether USDA had concluded that the LFPA program had changed in some way, or whether USDA's priorities had changed since December 2024. If the latter, the letter did not state what USDA priorities had been advanced by the LFPA25 Agreement when it was signed in December 2024, nor did it state what the new and different agency priorities were in March 2025.

43.    The LFPA program had not changed in any meaningful way between December 2024 and March 2025.

44.    On March 25, 2025, Secretary Redding wrote Deputy Administrator Tuckwiller, to reiterate the virtues of the LFPA program. A true and correct copy of that letter is attached as Exhibit 3.

45.    As Secretary Redding explained, LFPA had funded (as of that time) the purchase of 25.9 million pounds of food from local farms. That food went to food banks across the Commonwealth that in turn provided more than 5 million meals to the Commonwealth's most vulnerable citizens. Secretary Redding wrote that it would be "hard to imagine a program that better furthers the statutory priorities of USDA" than one, like LFPA, that simultaneously "supports local farmers, helps promote supply chain resiliency, and provides healthy food to the neediest residents."

46.    Secretary Redding urged USDA to rescind the termination notice and, if it would not, to "provide [PDA] with the factual and legal basis for your determination that this agreement 'no longer effectuates agency priorities.'"

47.    Secretary Redding also asked USDA to "provide your written procedures for processing objections, hearings, and appeals, which you are required to maintain under 2 C.F.R. § 200.342" or to inform PDA that no such procedures existed.

48.     USDA never responded to Secretary Redding's letter.

49.     Instead, on April 14, Secretary Rollins visited Pennsylvania and accused Secretary Redding and PDA of not having the "facts right." She further insisted that Pennsylvania had "tens of millions of dollars sitting in state accounts" for its food assistance programs and that "the money is there."[2]

50.     After Secretary Rollins's comments, Secretary Redding sent a subsequent letter to remind her that LFPA is a reimbursement program—Pennsylvania spends its own funds initially and then seeks federal reimbursement for authorized expenses. For such a program, no federal money—let alone millions of dollars—is held in a Pennsylvania account. A true and correct copy of that letter is attached as Exhibit 4.

51.     Secretary Redding again explained how LFPA serves both PDA's and USDA's goals. He noted that LFPA dollars allow regional food banks to purchase healthy food from local farmers and feed Pennsylvania families.

52.     Secretary Rollins did not respond to this letter.

---

[2] Jaxon White, *With potential lawsuit pending, Pa. agriculture secretary slams USDA canceling $13M food bank program*, Lancaster Online (Apr. 18, 2025), available at: https://lancasteronline.com/news/politics/with-potential-lawsuit-pending-pa-agriculture-secretary-slams-usda-canceling-13m-food-bank-program/article_13ee9eff-bac5-4c69-b904-2d699b9c5122.html; John Cole, *U.S. Agriculture Secretary Brooke Rollins defends Trump tariffs in visit to Pennsylvania*, Pennsylvania Capital-Star (Apr. 14, 2025), available at: https://penncapital-star.com/agriculture-pa-farms/us-agriculture-secretary-brooke-rollins-defends-trump-tariffs-in-visit-to-pennsylvania/.

53.    On May 7, 2025, USDA sent a letter formally terminating the LFPA25 agreement. The termination letter stated that "the agreement was terminated in accordance with 2 CFR § 200.340(a)(4) and the terms and conditions of the award." No specific term or condition was cited. A true and correct copy of that letter is attached as Exhibit 5.

54.    Like the termination notice, the termination letter makes clear that USDA's primary basis for terminating the LFPA25 Agreement was not contractual, but rather regulatory. It identified that the basis for the termination was §200.340. Although the LFPA25 termination letter refers to the "terms and conditions of the award," no term or condition of the award is cited.

55.    In subsequent conversations initiated by Secretary Redding, USDA restated that it would not change its termination decision nor provide any further process for challenging or revisiting the termination.

D.    **Impact of the Termination on Pennsylvania Farmers and Food Banks**

56.    The need for food assistance remains as strong as ever. For example, according to the Central PA Food Bank, food insecurity has increased about 30% in Pennsylvania's Dauphin County since 2022. The Warminster Food Bank in Bucks County distributed 30,000 pounds of food a year in 2019 and now distributes 31,000 pounds of food in one month alone. In 2020, the Greater Pittsburgh Community Food Bank served 40 million meals, and it served 48 million meals in 2024. Finally,

a 2023 survey reported that around 20% of students are worried about running out of food at home in the Pennsylvania Youth Survey. In 2021, that number was just 9% of students.

57.    Since being awarded LFPA25 funds, PDA has developed plans for how it would use the $13 million award. PDA intended to begin using funds from the LFPA25 Agreement in July 2025 through a contract with Feeding Pennsylvania to purchase unprocessed and minimally processed food from Pennsylvania farmers and producers.

58.    Feeding Pennsylvania is an umbrella organization that subcontracts with more than a dozen large regional food banks throughout Pennsylvania to provide food to needy Pennsylvanians through their local food pantries and soup kitchens.  None of the $13 million award would have been used for administrative costs; 100% of the money would be used for food purchases.

59.    That $13 million LFPA25 award would have allowed Feeding Pennsylvania to purchase approximately 14.9 million pounds of food from local Pennsylvania farmers, which would have been supplied to approximately 3.2 million low-income Pennsylvania households.

60.    Ensuring Pennsylvanians have access to food and supporting Pennsylvania farmers are core aspects of PDA's statutory duties.

61.     The abrupt and unexpected termination of the LFPA25 Agreement will

therefore interfere with PDA's work and have a devastating effect on Pennsylvania

food banks, which were relying on the availability of the award funding, and the

low-income Pennsylvanians they serve. PDA and residents of the Commonwealth

will now be deprived of funding for a critical source of food and nutrition.

62.     Similarly, the roughly 190 Pennsylvania farmers that PDA works with

to supply food banks with fresh local food will lose an important market for their

farm products, which in some cases was the difference between having a place to

sell a bumper crop and seeing it go to waste.

## CLAIMS FOR RELIEF

### Count I – Violation of the Administrative Procedure Act
### Arbitrary and Capricious

63.     Plaintiffs incorporate by reference the allegations contained in the

preceding paragraphs.

64.     Under the Administrative Procedure Act ("APA"), a reviewing court

shall hold unlawful agency action that is "arbitrary" or "capricious." 5 U.S.C.

§ 706(2)(A).

65.     Defendants are agencies under the APA. 5 U.S.C. § 551(1).

66.     Agency action is arbitrary or capricious where it is not "reasonable and

reasonably explained." *Ohio v. Environmental Protection Agency*, 603 U.S. 279, 292

(2024). This standard requires that agencies provide "a satisfactory explanation for

its action[,] including a rational connection between the facts found and the choice made." *Id.*

67.    Agency action must be judged based on the contemporaneous reason given for the action.

68.    Additionally, if agency action reflects a changed position, the agency must, at a minimum, acknowledge and display awareness of the change. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

69.    Here, USDA's decision to terminate the LFPA25 Agreement under 2 C.F.R. § 200.340 is arbitrary and capricious.

70.    In its termination notice and letter, USDA has claimed that the LFPA25 Agreement no longer effectuates its priorities but has completely failed to identify what its priorities are or how the program fails to advance them.

71.    That sort of explanation is an essential piece of the reasoned decision making that the APA demands.

72.    Likewise, USDA's decision that the LFPA25 Agreement no longer effectuates agency priorities is a change in position for USDA that the federal agency has completely failed to explain, justify, or even acknowledge.

73.    The determination—had it been explained—that a program in which 100% of funding supports local farmers and feeds Pennsylvanians with limited access to food no longer effectuates USDA's or AMS's priorities is arbitrary and

capricious, given that such a determination would be at odds with the federal department's and agency's core functions. PDA's use of the LFPA25 funds would have continued to support Pennsylvania agricultural supply chain by purchasing domestic food to then feed families.

74.     Further, USDA's termination of the LFPA25 Agreement fails to consider the reliance interests PDA, Pennsylvania farmers, food banks, and the people who rely on Pennsylvania's charitable food network have in the availability of funds that USDA agreed to distribute to PDA through the LFPA25 Agreement.

75.     For each of these reasons, the decision that the LFPA25 Agreement no longer supports USDA's priorities and the resulting decision to terminate the agreement are arbitrary and capricious.

**Count II – Violation of the Administrative Procedure Act
Unlawful Agency Action**

76.     Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs.

77.     Under the Administrative Procedure Act, a reviewing court shall hold unlawful agency action that is "not in accordance with law" 5 U.S.C. § 706(2)(A).

78.     Executive agencies must follow the laws that govern their conduct and may not engage in any conduct that violates the law.

79.     Under 2 C.F.R. § 200.340, a federal agency may terminate an award "pursuant to the terms and conditions of the Federal award, including, to the extent

authorized by law, if an award no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(4).

80.    But while § 200.340 allows for termination under some circumstances, an agency's discretion is limited. For example, § 200.340 expressly provides that the federal agency "must clearly and unambiguously specify all termination provisions in the terms and conditions of the Federal award." 2 C.F.R. § 200.340(b).

81.    The limits of federal agency discretion in § 200.340 were further laid out by the Office of Management and Budget ("OMB") when it amended its Uniform Grant Guidance ("UGG") in 2024. There, OMB made clear that the purpose of subsection (a)(4) in § 200.340 was not to give federal agencies unfettered discretion to unilaterally cancel grants, but rather to allow the federal agency to terminate grant agreements for reasons that are expressly provided in the grant agreements.

82.    Specifically, OMB stated that § 200.340(a)(4) provides that "a Federal award may be terminated by the Federal agency or pass-through entity pursuant to the terms and conditions of the Federal award." 89 Fed. Reg. 30046-01, 30089 (April 22, 2024). A federal agency may terminate an award if it "no longer effectuates the program goals or agency priorities," but only "[p]rovided that the language is included in the terms and condition of the award." *Id.* Further, OMB clarified that this requirement should be read together with § 200.340(b), which "direct[s] Federal agencies and pass-through entities to clearly and unambiguously specify all

termination provisions in the terms and conditions of the award." *Id.*

83.    The LPFA25 Agreement does not specify any circumstances under which the agreement can be terminated under § 200.340.

84.    Moreover, the LFPA25 Agreement specifically identifies the program's purpose as "to maintain and improve food and agricultural supply chain resiliency through the procurement of local, domestic and unprocessed or minimally processed agricultural commodities."

85.    Pennsylvania's LFPA program, including the LFPA25 Agreement, still supports those objectives. Indeed, there have been no changes in the administration of LFPA's program since USDA and PDA completed the LFPA25 Agreement.

86.    Because the circumstances under which § 200.340 permits termination of an agreement do not apply here, USDA acted in violation of the law.

### Count III – Violation of the Administrative Procedure Act
### Contrary to Law – Violation of UGG

87.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs.

88.    Under 2 CFR § 200.341, a federal agency terminating a grant "must provide written notice of termination to the recipient or subrecipient," and that notice should include, among other things, "the reasons for termination." 2 CFR § 200.341(a).

89.    Further, the UGG provides that a federal agency must provide recipients of terminated grants "with an opportunity to object and provide information challenging the action." 2 CFR § 200.342. To maintain this due process right, a federal agency "must maintain written procedures for processing objections, hearings, and appeals," and it must comply with those procedures during any challenge to an agency termination. *Id.*

90.    USDA's termination of the LFPA25 Agreement failed to provide any opportunity to challenge the decision. Indeed, USDA failed to do so despite PDA's specifically informing USDA that it wished to use the mandatory appeals process and requesting information about USDA's required appeal procedures.

## Count IV – Fifth Amendment of the United States Constitution
## Procedural Due Process

91.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs.

92.    The core requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner. *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). Where the government seeks to deprive a party of an interest in liberty or property, some form of hearing is required prior to the deprivation of that property interest. *Id.*

93.    Here, Plaintiffs have a protected interest in the continued receipt of LFPA25 funding for the duration of time indicated by the USDA. This interest is

20

grounded in policy, not mere contract—the LFPA program was born from an act of Congress and effectuated through the USDA for multiple years, and its continuation for another three years had been expressly promised by the USDA as recently as January 2025.

94.     In May 2025, USDA cancelled the LFPA25 funding without providing any meaningful legal process. Although Plaintiffs were given 60 days' notice, they were not given any opportunity to be heard during that time.

95.     In fact, Plaintiffs affirmatively sought an opportunity to be heard, but USDA refused to provide any such opportunity. Twice, PDA sent letters to USDA seeking to challenge the decision to cancel the LFPA25 grant termination, but USDA never provided any response.

96.     Secretary Redding's letters make clear why a hearing in this case would have been more than a mere formality. The USDA purported to cancel the LFPA25 grant because it "no longer effectuates agency priorities," but it refused to explain this conclusion. A hearing would have forced USDA to present reasons for the grant's cancellation, including what specific agency priorities were no longer being served by the program. Plaintiffs would have then had the opportunity to rebut by showing that the program as implemented does in fact continue to serve agency priorities.

97.     As described above, this constitutionally required process is enshrined in the UGG itself. Although § 200.340(a) allows an agency to terminate a grant for any number of reasons, § 300.342 requires the agency to "maintain written procedures for processing objections, hearings, and appeals." These procedures are the hallmark of due process, and they were completely ignored here.

98.     Because USDA provided Plaintiffs with no opportunity to be heard at a meaningful time and in a meaningful manner, the cancellation of the LFPA25 grant violated the Fifth Amendment's guarantee of due process.

## PRAYER FOR RELIEF

Plaintiffs respectfully ask that this Court enter the following relief:

a.     Declare that Defendants' determination that the LFPA25 Agreement no longer effectuates agency priorities, and the resulting termination of that agreement, is arbitrary and capricious;

b.     Declare that Defendants' determination that the LFPA25 Agreement no longer effectuates agency priorities, and the resulting termination of that agreement, is contrary to law;

c.     Declare that Defendants' determination that the LFPA25 Agreement no longer effectuates agency priorities, and the resulting termination of that agreement, violates due process;

d.      Vacate Defendants' determination that the LFPA25 Agreement no longer effectuates agency priorities, and the resulting termination of that agreement;

e.      Award plaintiffs' costs and reasonable attorneys' fees, as appropriate; and

f.      Grant any other relief the Court deems just and appropriate.

June 4, 2025                                    Respectfully submitted,

John H. Howard (Pa. 84002)                     Jennifer C. Selber
Chief Counsel                                  General Counsel
Pennsylvania Department of Agriculture
2301 N. Cameron Street                         Michael J. Fischer (Pa. No. 322311)
Harrisburg, PA 17110                           Executive Deputy General Counsel

                                               s/ *Jacob B. Boyer*
                                               _____
                                               Jacob B. Boyer (Pa. No. 324396)
                                               Stephen R. Kovatis (Pa. No. 209495)
                                               Deputy General Counsel
                                               Office of General Counsel
                                               30 North Street, Suite 200
                                               Harrisburg, PA 17101
                                               jacobboyer@pa.gov
                                               (717) 460-6786


                                *Counsel for Plaintiffs*